# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

DARLINE STEWART,

    Plaintiff,

v.

LEPRINO FOODS COMPANY, INC, a Colorado corporation,

    Defendant.

## CIVIL COMPLAINT AND JURY DEMAND

Plaintiff, by and through her undersigned attorney, for her Complaint against Defendant, alleges and states as follows:

### NATURE OF THE ACTION

1. This is an action for racial discrimination, for failure to promote, hostile work environment, disparate treatment and impact, and retaliation, in contravention of Title VII of the Civil Rights Act of 1964, *et seq.*, 42 U.S.C. §2000e, *et seq.*, 42 U.S.C § 1981, the Civil Rights Act of 1991, and 42 U.S.C. §1981A, and the corresponding provisions of the Colorado Anti-Discrimination Act ("CADA"), C.R.S. §24-34-401 *et seq.* Plaintiff seeks an award of employment compensation commensurate with those sums attributable to her unlawfully denied promotions, other compensatory and punitive damages, expert witness fees, reasonable attorney fees and court costs, and other equitable and remedial relief.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction), 42 U.S.C. §1334 (Civil Rights Jurisdiction), and 42 U.S.C. §1367

(Supplemental Jurisdiction).  Plaintiff's claims are based on Federal Law under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981 and 42 U.S.C. §1981A.

3. Venue is appropriate in this Court since the acts complained of predominately occurred in Greeley, Weld County, Colorado.

4. Plaintiff has complied with all conditions precedent to the filing of this action and received the Notice of Dismissal and Right to Sue on or about August 30 2016.

## PARTIES AND PERSONAL JURISDICTION

5. Plaintiff resides in the City of Greeley, Weld County, Colorado.

6. Defendant is a large "white owned and operated" Colorado corporation in good standing, with a principal office located at 1830 West 38th Avenue, Denver, CO 80211, and whose cheese processing plant in question is located at 1302 1st Street, Greeley, CO 80631.

7. At all times relevant, upon information and belief, Defendant is, and has, been the World's largest corporate producer of mozzarella cheese and related dairy based products, with plants and facilities throughout the Nation.

8. At all times relevant, upon information and belief, Defendant is, and has been, not only a large "white owned" corporation, but also a "white run" company, as well, with Caucasians and other non-Hispanics and non African Americans holding almost all upper and middle management, and most of the lower level managerial and supervisory level jobs, with most such minority or protected class employees working in lower level, lower paying production type jobs.

9. At all times relevant, upon information and belief, to facilitate, maintain, and further its foregoing endemically discriminatory, white dominated and preferred corporate

operations or business model, Defendant long utilized one or more patently and invidiously discriminatory employment applications until it was forced, by and through litigation brought against it therefor by the U.S. Department of Labor's Office of Federal Contract Compliance Program, to cease and desist therefrom.

10. At all times relevant, upon information and belief, Defendant has engaged in a pattern or practice of "company-wide," "top down" unlawful racial, national origin and ethnic discrimination throughout its national regions and facilities.

**GENERAL ALLEGATIONS**

11. Prior to Plaintiff's current employment at Defendant's facility in Greeley, Colorado, she worked for Defendant at two other like or substantially similar cheese processing facilities at 2401 N. Macarthur Drive, Tracy, California 95376, and at 5600 Omaha Rd., Roswell, New Mexico 88203.

12. Plaintiff has been employed by Defendant for approximately 23 years.

13. Plaintiff had been employed at the Defendant's Roswell, New Mexico facility for many years as a Sanitation Team Lead, leading a 21 person crew.

14. Defendant's corporate headquarters is involved in virtually every important aspect of the operations and management of its facilities.

15. In 2013, Plaintiff contacted Human Resources at the new Greeley, Colorado facility, requesting a lateral employment transfer.

16. Initially, Defendant's Human Resources person in Greeley assured her that the transfer was appropriate.

17. Plaintiff submitted an internal transfer form for Greeley for the following positions: Sanitation Team Lead, Starter Room Team Lead, Milk Receiving Team Lead and Quality

Team Lead. Plaintiff had experience in all of these areas.

18. However, when Plaintiff called again to find out the status of the transfer, she spoke with a Greeley Human Resources ("HR") person named Dan Coleman, who told her, "I know who you are, and you will not be hired here." She was astounded and responded, "you must have the wrong person." He stated, "No, I know who you are," and hung up on her. Plaintiff concluded that Mr. Coleman's behavior was due to her race, since there appeared to be no other rational explanation therefor.

19. Plaintiff was shocked, so she contacted Steve Schmidt at corporate headquarters. Plaintiff had worked with Mr. Schmidt at the Roswell facility. Plaintiff told him what had happened and he apologized, telling her he would look into it. Then, Lisa Prater, the HR Director of the Greeley facility, called her. While she apologized for Mr. Coleman's behavior, she informed Plaintiff that she would have to go through the application process like anyone else. Plaintiff had to go through all three interviews, and then she was given less than two weeks to move from New Mexico to start work in Greeley on February 25, 2013.

20. Lisa Prater, Director of Human Resources, falsely said that the Greeley plant wasn't going to have Team Leads in Milk Receiving, Starter Room or Sanitation, and that Plaintiff did not have experience in Quality. <u>Yet, all of these areas have Team Leads in Greeley.</u>

21. Later Plaintiff discovered that Lisa Prater had transferred three Team Leads from other Leprino facilities <u>laterally because they were Caucasian and Plaintiff was not.</u>

22. Plaintiff was not given a team lead position. Instead, she was unfairly hired only as a Team Member.

23. Although at first Plaintiff was not personally subjected to further racial discrimination or blatant hostility, she watched and was aware of the treatment of other such minority employees. At the time, Plaintiff was the only black employee in the Whey Department.

24. Plaintiff escaped such treatment until she was called to HR by Lisa Prater to ask her whether she intended to attend the corporate Christmas Party.  The question seemed to imply that Plaintiff was attending the party for reasons other than to have a good time. Lisa Prater stated that she was told that Plaintiff wanted to go to see Kari Rocco kiss her same sex partner. Plaintiff was taken aback, and said "No". It was such an absurd statement that she just laughed.  Plaintiff attended the corporate Christmas Party with her husband, a Caucasian.

25. Thereafter, Plaintiff became the subject of abuse, harassment, hostility, racial remarks, and baseless accusations. Plaintiff believes that much of this discriminatory treatment was because management discovered that she was married to a Caucasian.

26. For example, after the Christmas Party in early January 2014, Lisa Prater and Cole Hamley accused Plaintiff of "bad mouthing" management.  Plaintiff denied this, and asked what she was supposed to have said. They could not give her an explanation, but told her that they had complaints, and were going to "investigate" them.

27. Nothing ever came of this baseless accusation or the supposed investigation. Rather, it was pure harassment of Plaintiff.

28. The harassment intensified after Plaintiff complained to Human Resources that her Team Leader continually called their department supervisor, Robert Floyd, the "Grand Dragon," and that their discussions were embarrassing.

29. Plaintiff had tried to handle the matter herself by asking them to stop, because it made

her uncomfortable. Plaintiff asked the Team Lead if she even knew the implications of that name, "Grand Dragon."

30. Even though the Plaintiff made a formal complaint to Human Resources, nothing was done. Instead, the racially charged name calling and other abuse continued.

31. As a Membrane Specialist, it was Plaintiff's responsibility to train new members of her team, which included Kari Rocco ("Rocco"), a Caucasian. It appeared to her that Kari was not trying to work to learn the membrane processes. Every day it seemed that Plaintiff had to start over with her training. Consequently, she was not capable of performing the tasks, so she simply would not work.

32. Yet, when Plaintiff confronted her in this regard with the Supervisor present, she falsely stated that she understood the processes completely. Since Kari did not do her share of the work, another membrane operator was added to that team.

33. Even though Human Resources and the Supervisor, Robert Floyd, were aware of Ms. Rocco's work conduct, they did not reprimand her because she was Caucasian. Rather, the Supervisor falsely accused Plaintiff (African American) and her co-worker, Benny (Hispanic), of failing to properly train Ms. Rocco.

34. Plaintiff endured constant harassment by Human Resources over bogus complaints by being called to the HR office repeatedly for no legitimate reason. Plaintiff was reprimanded because "someone complained because she hugged two co-workers," one, because she congratulated him on his new baby, and the other for her strength in battling cancer. As a result, Lisa Prater and Cole Hamley indicated that there should be a program on appropriate behavior in the workplace. Plaintiff asked them, "what should she have done when Jim Leprino, whom she had known for years, saw her when he was visiting

the facility, and she put out her hand to shake his hand, but he gave her a hug?"

35. Yet, Plaintiff was "coached" because of this "hugging." However, when Lisa Prater or other employees hugged a co-worker, it was considered to be appropriate.

36. Plaintiff was unhappy in the Whey Department because of the foregoing harassment and hostility.

37. So, Plaintiff applied for a Supervisor Training Position in another department, but she was told that she was qualified, but that her experience was not at this plant in Greeley. Plaintiff concluded that she was denied the job due to her race because, even though this was a new plant, the job was the same.

38. Demetrio Moreno, a Hispanic team member, was harassed, belittled, degraded and constantly called to Human Resources regarding similar bogus complaints. However, he was so concerned that he might lose his job that he would not stand up for himself, even when he was referred to as a "cougar" by Robert Floyd.

39. When Dorothy Maes, a Hispanic co-worker, expressed concerns regarding the hostile work environment and national origin discrimination at the hands of Amy Weaver, Plaintiff recommended that she follow the chain of command, starting with her supervisor, and then to Human Resources. But, the chain of command failed her. Dorothy even endured physically threatening conduct perpetrated by Amy Weaver, a Caucasian, who pushed her and threw a computer mouse at her. Although Dorothy Maes was of Hispanic descent, she was not "Mexican." Yet, even knowing this, Amy Weaver would call her and all other Hispanic employees, "lazy ass Mexicans" and other ethnic slurs. Nothing was done, and Amy Weaver was not reprimanded.

40. Sylvia Jaramillo, a Hispanic co-worker, applied for several jobs, but each time was

turned down because "she wasn't ready," and these positions were instead filled by Caucasian employees. Yet, she was far more qualified than Amy Weaver, a Caucasian, for the position.

41. When Plaintiff's concerns with regard to the unfair treatment, hostile environment, and racial and ethnic discrimination were not being addressed either by her supervisor or by Human Resources, she realized that her chain of command had broken down, as well.

42. Due to the ongoing harassment by Human Resources, the ongoing racially charged name calling, and the pervasive degrading of minorities, Plaintiff tried to protect herself by filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission.

43. Initially after the Charge of Discrimination was filed, Human Resources stopped the harassing and baseless accusations, and the threatening of bogus "investigations." But, the racially charged language did not.

44. Plaintiff's co-worker, Tom, had been referring to her as "colored," Plaintiff told him that she was not "colored," "but was black." He stopped. Then, he began using the "N," word, referring to a friend of his in conversations with her. The first time Plaintiff thought it was a slip, but when he did it again, Plaintiff believed that it was intentional. Plaintiff could not go through her chain of command, so she talked with the Team Lead/now Supervisor, Mr. Ricki, of another team, who spoke to Tom about this. Then, Tom apologized to her.

45. Last year, Plaintiff applied for the Supervisor Training Program, but again was told that she was qualified, but that her experience was not at the Greeley facility. Plaintiff clearly had prior experience doing the job that she had applied for.

46. This was yet another pretext to deny her another better job due to her race, and to retaliate against her for her complaints and for filing a Charge of Discrimination.

47. Not long thereafter, Plaintiff saw Tom Hegarty, Senior Vice President, Production Operations for Leprino, who had come to Greeley to introduce a new product in the protein department. Plaintiff had corresponded with him at Roswell. Plaintiff spoke with him about the unfair treatment, hostile environment and some of the above discrimination at this plant.

48. Mr. Hegarty was so upset about the use of the "N" word at the plant that he ordered Steve Schmidt to come talk to Plaintiff.

49. Steve Schmidt and Kelly Soja from corporate HR met with Plaintiff at the Greeley plant. Steve Schmidt opened the discussion by asking, "What has you in a frenzy now?"

50. Steve Schmidt told Plaintiff that Mr. Hegarty had told him that he had better get to the plant and talk to her. Plaintiff told Steve that if people have discriminatory attitudes at home it is ok, but when they project that discrimination in the workplace, it is not ok. Then, Steve Schmidt began asking her questions about the U.S. Equal Employment Opportunity Charge of Discrimination that she had filed. He told Plaintiff that if he asked about the Charge, she didn't have to discuss it. Then, he asked about the problems Plaintiff had with Robert Floyd and Kari Rocco.

51. Plaintiff explained that she was present when Robert Floyd and Sylvia Jaramillo were talking about her break time entry, and he told her in a threatening manner to either come into his office or go home. Plaintiff was in the hallway when Sylvia left Robert Floyd, and she told Plaintiff that she was going home because it was unfair. Robert Floyd falsely accused her of being insubordinate. Yuki, Sylvia's supervisor, asked Plaintiff if

Sylvia was being insubordinate. Plaintiff told her, "No. They were just talking, as everybody does. She just asked him a question, and complained about him changing the time."

52. Because Plaintiff told Yuki the truth that Sylvia was not insubordinate, Plaintiff became a retaliatory target of Robert Floyd's discriminatory conduct, as well.

53. Plaintiff overheard Robert Floyd discussing the incident with Roxanne Norris, another supervisor. Apparently, as a result, they prepared a disciplinary memo regarding the incident with Sylvia. However, they did not limit the memo to that incident alone, but added numerous long past incidents that had nothing to do with the argument regarding Sylvia's break time. Plaintiff found the memo on the copy machine, made a copy, and gave it to Sylvia. When Lisa Prater called Sylvia to come to Human Resources to discuss the memo, Sylvia showed the memo to Prater before the conversation got started. Lisa Prater apologized for the memo and the breach of confidentiality. However, the memo was mysteriously posted subsequently on the employees' bulletin board.

54. Plaintiff discussed these issues with Steve and Kelly. Then Steve talked about Robert Floyd and Lisa Prater. Steve Schmidt told Plaintiff, "I have known you for a long time. A wrong was done, but moving forward, what job would you like to have?" Plaintiff didn't know what to say, so Plaintiff told him "None, I am ok where I am at." He stated that Plaintiff used to always be smiling and happy. What is it going to take to get you back to the person you used to be?" Plaintiff told him, "I don't know."

55. Any pleasure in her work had been taken away.

56. About two weeks later there was a posting for two Sanitation Team Leads in Quality Control. Plaintiff went home, typed up her resume, prepared the interest form and got

her Supervisor, Nikki Gee, to sign it.  Then, she gave it to Rachael in Human Resources.  On June 27th Rachael contacted her, asking her to come to Human Resources. She said she had good news.  Plaintiff was given the job and needed to accept or reject it. Plaintiff accepted the job.  At the same time, David, a Caucasian, accepted the other job.

57. However, Plaintiff was told that she could not move to the new position until they found a replacement for her and she had trained the new person.

58. Again, this was a pretext used to prevent Plaintiff from moving to the new position and to retaliate against her.  Since Plaintiff and other Membrane Specialists had to train themselves using materials provided by Defendant, there was no reason for Plaintiff to train a replacement.

59. Plaintiff accepted the job on June 27, 2016, but she was not allowed to move to the new position until November, 2016.

60. In contrast, David, the other employee hired for the other position with her, was moved to the new position within one week.

61. Furthermore, pursuant to the 2/20/2015, Greeley Guidebook Update, when an employee is assigned to a new position, "if you are not transferred to your new position within the 30 day period, you will start receiving the new wage on the 31st day, unless the new position is at a lower pay." Yet, Plaintiff belatedly and inexplicably received her new wage for the first time for the pay period 8/28/2016-9/10/2016, contrary to this policy.

62. Plaintiff has endured intentional ongoing racial discrimination, hostility, baseless harassment, and retaliation throughout her employment with Defendant.

63. Plaintiff and all other of Defendant's minority employees know that they will never be able to advance to management positions within Defendant's company because of

Defendant's preference for Caucasian employees *viz-a-viz* Hispanics and African Americans.

64. The Greeley Leprino facility, *inter alia*, is a hostile workplace, where racial and ethnic discrimination is condoned. Despite professed claims of being an equal opportunity employer and/having written anti-discrimination employee policies, these policies are routinely ignored and are not enforced. Despite Plaintiff's complaints of hostility, retaliation, and discrimination, no meaningful action has been taken by corporate management and/or the Greeley facility Human Resources.

**FIRST CLAIM FOR RELIEF**
**(Title VII and 42 U.S.C. § 1981for Racial**
**Discrimination and Hostile Work Environment)**

65. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

66. Plaintiff and others similarly situated experienced un-remediated, overt, intentional, flagrant, offensive and invidious discrimination, abuse, harassment, and retaliation in the workplace.

67. Plaintiff had a good faith belief that the unlawful and intentional conduct was discriminatory and otherwise unlawful, and tried to protect herself from such further acts of racial discrimination by complaining to her supervisors, including Yuki Sakai, and to Lisa Prater, Defendant's Human Resources Director. She is also a witness in support of her co-workers, Dorothy Maes, and Sylvia Jaramillo's similar allegations against Defendant in their companion cases pending in this Court, 15-cv-00022 and 16-cv-0092, respectively. Plaintiff thereby engaged in protected opposition to such discriminatory behavior and treatment.

68. Despite Plaintiff's requests for relief from such acts of racial discrimination, abuse, and retaliation, Defendant, its agents, management, and employees did nothing to protect Plaintiff, her rights and/or protected interests in her employment.

69. Further, Plaintiff endured an overtly and pervasively hostile, abusive, and invidiously discriminatory and retaliatory work environment that was steeped in racial and national origin or ethnicity animus. Due to her African American ancestry, Plaintiff was victimized thereby, including with respect to the terms and conditions of her employment, which were accordingly adversely affected by such hostile, retaliatory, and endemically discriminatory and otherwise unlawful conduct.

70. Plaintiff complained about the discriminatory and retaliatory conduct, including to her supervisor, Yuki Sakai, and to Lisa Prater, Defendant's Human Resources Director, Defendant, its agents, managers, and supervisors did nothing in response, thus permitting reasonable people to infer that the severe racial discrimination, hostile work environment, retaliation and other forms of invidious discrimination and retaliation that permeated the workplace exhibited by said supervisors and co-workers were thereby condoned.

71. By allowing Plaintiff's managers, supervisors and co-workers to engage in such offensive and pervasive discrimination without proper supervision, discipline or investigation of them, Defendant created, maintained, fostered, or furthered such an overtly hostile, abusive, discriminatory and retaliatory work environment that so victimized Plaintiff and her above co-workers.

72. As a direct and proximate result of the acts and omissions of Defendant, its management, agents, and employees described herein, Plaintiff has suffered and incurred, or may reasonably be expected to suffer or incur, the following damages and other losses, or is

otherwise entitled to recover: ongoing employment compensation attributable to lost promotions with higher pay and better fringe benefits; compensatory damages that include emotional anguish, upset, or distress; embarrassment or humiliation; loss or impairment of enjoyment of life; pain and suffering; damage to character or reputation, credit, or creditworthiness; and such other damages as may be proven at trial, including incidental and consequential damages, plus interest, reasonable attorney fees and court costs.

### SECOND CLAIM FOR RELIEF
(Hostile work environment)

73. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

74. The terms "nigger" and "Grand Dragon" are steeped in racial animus. Plaintiff was accordingly shocked and offended thereby, and reasonably believed that the terms and conditions of her employment were being impacted adversely by such conduct.

75. Thus, Plaintiff complained to the site manager about this invidiously racially discriminatory conduct. Although the site manager stated that "something would be done about it," Defendant, its agents, and employees did absolutely nothing, thereby leading a reasonable person to infer that the racial animus exhibited by the co-worker was condoned and permeated the workplace.

76. By allowing Plaintiff's co-workers to engage in such offensive discrimination without proper investigation, supervision or discipline of said employees, Defendant created, maintained or fostered a hostile work environment for the Plaintiff and others similarly situated.

77. As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Plaintiff has suffered and will continue to suffer, such damages and harm as may be proven at trial, including those described above.

### THIRD CLAIM FOR RELIEF
(Retaliation in Violation of Title VII)

78. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

79. Under the circumstances of this case, Plaintiff had a right to enter into a contract for employment with Defendant with the reasonable expectation that she would be treated fairly and lawfully in a non-discriminatory manner and to not be subjected to retaliation for complaining about such workplace discrimination and other unlawful acts or omissions.

80. Plaintiff went to her supervisors and Defendant's Human Resources Department complaining about and questioning the widespread racial and national origin discrimination, abuse, and retaliation, including Defendant's acts in: intentionally passing over her applications for different jobs due to her race; and in failing to act appropriately in response to her complaints in regard to the foregoing matters.

81. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered or incurred, and will likely continue to suffer or incur, such damages and losses described hereinabove and such other damages and losses as may otherwise be proven at trial.

### FOURTH CLAIM FOR RELIEF
(Disparate Treatment)

82. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set

forth herein.

83. Plaintiff, the only African American female, was treated worse than her Caucasian co-workers with regard to her work environment, as well as with regard to the terms and conditions of her employment due to a systemic or companywide racial animus that constituted an informal policy on Defendant's part.

84. Defendant provided Plaintiff with an employee manual with a written disciplinary policy which the Defendant did not follow when deciding to intentionally retaliate against the Plaintiff based on her complaints of discrimination.

85. This disparate treatment would not have occurred if the Plaintiff were other than an African American or Hispanic employee.

86. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered and will continue to suffer, such damages and harm as may be proven at trial, including those described above.

### FIFTH CLAIM FOR RELIEF
(Disparate Impact)

87. Plaintiff incorporates by this reference all preceding paragraphs, as if fully set forth herein.

88. Defendant's overtly and invidiously racially discriminatory conduct permeates its hiring, promotion, and personnel policies, insofar as they apply to African American and Hispanic applicants and employees.

89. The direct and proximate impact of Defendant's disparate employment policies is demonstrated by the Defendant's failure to provide the Plaintiff, the only African

American in Defendant's company at the time, with the protections of the Defendant's personnel manual and other benefits which it would have provided to its Caucasian employees.

90. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, Plaintiff has suffered, and will continue to suffer, such damages and harm as may be proven at trial, including those described above.

WHEREFORE, Plaintiff prays that the Court award Plaintiff all relief requested herein including: employment compensation based upon her unlawfully denied promotions or transfers; compensatory and punitive damages, that include damages for severe emotional anguish, upset, or distress; embarrassment or humiliation, loss or impairment of enjoyment of life; pain and suffering; damage to reputation, credit or creditworthiness, and reputation or character; and for such other damages as may be proven at trial, including incidental and consequential damages, plus interest, reasonable attorney fees and court costs, as provided by 42 U.S.C §2000e, *et. seq.*, and other laws, and for such other relief as the Court deems consistent herewith.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: November 28, 2016

Respectfully submitted,

*/s/ Richard K. Blundell*
Richard K. Blundell, Esq.
Law Office of Richard K. Blundell
1233 8th Avenue
Greeley, CO 80631
Tel: (970) 356-8900
Fax: (970) 353-9977
Email: rick@rkblaw.net

Plaintiff's address:

Darline Stewart
1927 27th Avenue
Greeley, Colorado 80634

Darline Stewart
1927 27th Avenue
Greeley, Colorado 80634

Case 1:16-cv-02895-WJM-CBS   Document 1   Filed 11/28/16   USDC Colorado   Page 18 of 18

Darline Stewart
1927 27th Avenue
Greeley, Colorado 80634

18